# United States District Court, Northern District of Illinois

ORIGINAL

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 6405 | **DATE** | 4/24/2003 |
| **CASE TITLE** | Lucini Italia Company vs. Giuseppe Grappolini and Grappolini G. s.r.l. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Enter Final Judgment Order. For the reasons set forth in the Memorandum Opinion and Order, the Court directs the Clerk of the Court to enter judgment in favor of Plaintiff, Lucini Italia Company, and against Defendants Guiseppe Grappolini and Grappolini G. s.r.l., an Italian limited liability company, by mean of the Final Judgment Order dated 4/24/03 granting Plaintiff monetary damages in the amount of $6,761,913.20, a declaratory judgment, and a permanent injunction against the Defendants.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices

APR 28 2003
date docketed

docketing deputy initials

4/24/2003
date mailed notice

| DK | courtroom deputy's initials |
|---|---|

Document Number

126

U.S. DISTRICT COURT
CLERK
03 APR 25 PM 1:52

Date/time received in central Clerk's Office

DK
mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LUCINI ITALIA COMPANY, | ) | |
| | ) | |
| | ) | **Case No. 01 C 6405** |
| Plaintiff, | ) | |
| v. | ) | **Magistrate Judge Morton Denlow** |
| | ) | |
| GIUSEPPE GRAPPOLINI, and | ) | |
| GRAPPOLINI G. s.r.l., | ) | |
| | ) | |
| Defendants. | ) | |

DOCKETED

APR 2 8 2003

## MEMORANDUM OPINION AND ORDER

This case involves a breach of loyalty and theft of valuable trade secrets by a highly paid consultant to a small family business engaged in the sale of olive oil. Defendants vigorously defended this case until shortly before trial at which time their counsel withdrew. Defendants failed to appear at trial. The reason for their failure to appear is clear. They stole an important business opportunity from Plaintiff, misappropriated Defendants' valuable trade secrets for their own financial gain, and they do not wish to face the consequences.

The Court conducted a bench trial on February 24-25, 2003 in connection with the complaint brought by Plaintiff, Lucini Italia Company ("Lucini" or "Plaintiff") alleging that Defendants Giuseppe Grappolini ("Mr. Grappolini") and Grappolini G. s.r.l. ("Grappolini Company")(collectively "Defendants"), seized an exclusive contract with a key supplier for their own benefit and began marketing a new product by means of misappropriating trade secrets from Plaintiff. The Court has carefully considered the testimony of the three witnesses



who appeared at trial, the witnesses who appeared through depositions, the Plaintiff's trial exhibits, the Plaintiff's written submissions and arguments.

The following constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain findings may be deemed conclusions of law, they shall also be considered conclusions. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings.

## I. FINDINGS OF FACT

### A. Nature of the Action

1.      Lucini alleges that Defendants promised to obtain an exclusive contract with a key supplier, Vegetal Progress ("Vegetal"), but instead signed Vegetal to an exclusive contract with defendant Grappolini G. s.r.l. Lucini claims that after usurping Lucini's business opportunity with Vegetal, Defendants began marketing a new olive oil product substantially similar to the one Lucini had planned to market after securing the supply contract. In developing, producing, packaging, and marketing this new product, Defendants are accused of using trade secrets misappropriated from Lucini. Following Lucini's discovery of Defendants' activities, Lucini terminated its relationship with Defendants and pulled out of negotiations over a more expanded relationship. The parties dispute whether Lucini had good cause to terminate the contracts. At trial, Lucini asserted five causes of action: (1) breach of fiduciary duty; (2) fraud; (3) promissory estoppel; (4) violation of the Illinois Trade

Secret Act, 765 ILCS 1065/1 *et seq.*; and (5) declaratory judgment. Lucini had earlier asserted two other alternative legal theories for recovery, constructive fraud and unjust enrichment, but elected to withdraw these without prejudice at the time of trial.

## B. The Parties

2.     Plaintiff Lucini was an Illinois corporation at the time this action was filed and has since reincorporated in Florida. Plaintiff's principal place of business was in Chicago, Illinois at the time the lawsuit was filed. Lucini imports and sells premium extra virgin olive oil and other products of Italy. It was formed (under its former name, IGOPLX Incorporated) by Arthur Frigo, a Chicago entrepreneur and adjunct professor of management and strategy at Northwestern University's Kellogg Graduate School of Management. The Court will refer to Plaintiff by its current name, Lucini, even though it was named IGOPLX in its early years. Mr. Frigo is the Chairman of the Board of Lucini. The company's CEO is Mr. Frigo's daughter, Renee Frigo, and its President is Renee Frigo's husband, Daniel Graeff. Arthur Frigo, Renee Frigo, and Daniel Graeff testified in person at trial and their testimony was credible and consistent with the documentary evidence.

3.     Defendant Giuseppe Grappolini is a resident of Loro Ciuffenna, Italy. Mr. Grappolini served as a consultant to Lucini pursuant to a Consulting Contract dated December 22, 1997. (Px 17). Under the Consulting Contract, Mr. Grappolini worked on behalf of Lucini to develop Lucini Premium Select extra virgin olive oil as well as to develop a number of flavored olive oil products utilizing essential oils. Defendant Grappolini G. s.r.l. (the

3

"Grappolini Company") is an Italian limited liability company, with its principal place of business in Arezzo, Italy. Mr. Grappolini is the sole owner and operator of the Grappolini Company. The Grappolini Company distributes small volumes of extra-virgin olive oil in Chicago and other markets throughout the United States, and larger volumes in Europe. Between December 1997 and June 2000, the Grappolini Company served as Lucini's supplier of extra virgin olive oil pursuant to a December 1997 Supply Agreement.

4.     Both Defendants appeared in this case through Chicago counsel and actively participated in motion practice and discovery. They gave limited deposition testimony, but Giuseppe Grappolini and the Grappolini Company's bookkeeper, Morena Botti, refused to sit for continuations of their depositions ordered by this Court. Defendants' counsel was permitted to withdraw shortly after the close of discovery. Neither Defendants nor any counsel representing them appeared at the pretrial conference or at trial, although notice was sent directly to Defendants. Prior to trial, Defendants sent a letter to the Court indicating that they would not attend the trial or be represented. The Court draws an adverse inference by reason of Defendants' failure to appear at trial to rebut statements attributed to them or to explain, under oath, their position on key events. Although defendants did not appear, Lucini offered deposition designations from the depositions of (i) Giuseppe Grappolini, appearing individually and as a 30(b)(6) representative of the Grappolini Company, (ii) Morena Botti, the bookkeeper from the Grappolini Company, and (iii) Marco Milandri, the former assistant to Mr. Grappolini. (Px 301-303). Defendants' deposition testimony supports several elements

of Lucini's claims.

## C.   Background of the Relationship Between Lucini and Defendants

5.      Arthur Frigo is an experienced self-made businessman who began his business career working as a youth in his father's Italian food store.  Following college and a brief attempt as a pool table designer, he enjoyed a successful business career as a sales engineer, a management consultant and the operator and owner of a consumer products company which he eventually sold.  Mr. Frigo formed Lucini in 1996.  Lucini's first project was Italian premium select extra-virgin olive oil.  After performing an initial category analysis and select market research, Mr. Frigo perceived a lucrative, high-end niche market for the olive oil. Along with Renee Frigo and Daniel Graeff, Mr. Frigo developed a plan to fill the niche.  The success of the company and its product was to be based on extensive research and development and a substantial investment in advertising, packaging and targeted marketing, and a high-quality product.  Because the olive oil market is highly competitive, Lucini felt it was essential that Lucini's product have an appearance designed to attract customer interest even in a supermarket full of divergent olive oil products.  It was equally important to have a superior olive oil so that the customer would return to buy more.

6.      While Lucini was searching for a supplier of high quality extra virgin olive oil in Italy, it began market research in the United States including:  product names, bottle shapes and sizes, and marketing approaches.  Lucini's intention was to leave nothing to chance, testing every aspect of its products with focus groups and consumer trials before launching

its products nationally. Before Mr. Grappolini agreed to be Lucini's consultant, Lucini had spent in excess of $300,000 researching and laying the groundwork for its future products.

7.     After Lucini's representatives investigated and met with many potential olive oil suppliers and consultants, Lucini's officers focused on Giuseppe Grappolini and his company. On June 1, 1997, Mr. Grappolini entered into a non-disclosure agreement with Lucini. (Px 15). Lucini then shared with Mr. Grappolini many of the details of its ongoing research and solicited from Mr. Grappolini his views on the direction Lucini's initial product should take. Lucini believed Grappolini shared its goals to develop high quality Italian olive oil products.

8.     Working closely with Defendants, Lucini sought to develop a distinctive extra virgin olive oil that would become its signature product and sell in the range of $10 - $12 per bottle at retail. Arthur Frigo, Renee Frigo and Daniel Graeff tasted numerous different blends of extra virgin olive oils before pinpointing a flavor profile that they and Grappolini agreed would be exceptional and likely to appeal to Lucini's target audience in the United States and around the world. The resulting olive oil had a deep green color, unique taste, medium body, acidity of less than 0.4%, and a variety of other trade secret chemical-analytical characteristics. Because the flavor of an olive oil is impacted by such factors as the types of olives used, the soil content, weather, climate, method of picking the olives, the ripeness of the olive when picked, method of pressing, the time between harvest and bottling, and its exposure to light and air, the exact techniques Lucini developed and uses to produce a

consistent product from year to year are also secret. The difficulty in reproducing Lucini's olive oil by persons not versed in Lucini's trade secrets is evidenced by the fact that experienced olive oil purveyors and cultivators—who were solicited to replace the Grappolini Company after the Supply Contract was terminated—could not recreate Lucini Premium Select until Lucini disclosed its methodology and techniques.

9.  After forming a friendship with Mr. Grappolini and developing a respect for his ability to taste olive oil, the Frigos and Graeff chose Grappolini and his company to become their primary consultant and supplier. On December 22, 1997, Lucini entered into an Extra-Virgin Olive Oil Supply Agreement with the Grappolini Company and a Consulting Agreement with Grappolini. In these agreements, Defendants acknowledged the valuable and confidential nature of Lucini's customer information, product development plans, marketing plans and strategies, and design products. Grappolini was generously compensated for his consulting efforts on Lucini's behalf. Lucini paid him $12,500 per month in November and December of 1997, $12,500 per month in 1998, $15,000 per month in 1999, and $16,500 per month in 2000 until termination in June 2000. Apart from the hundreds of thousands of dollars in consulting fees paid to Grappolini, Lucini also reimbursed him for all of his travel and related expenses. Lucini also paid the Grappolini Company for the oil it supplied. In respectively becoming Lucini's consultant and supplier, Grappolini and the Grappolini Company entered into an agency relationship with Lucini, the principal.

10.  To succeed and distinguish their company in the market, the Frigos created

Lucini as a distinctive brand, and also "branded" Grappolini—spending substantial time and money promoting and marketing Giuseppe Grappolini as an olive oil expert and dubbing him a "master cultivator" in its literature, commercials, and in person at speaking engagements with food sector experts. Lucini paid for Grappolini to take courses to make him a better public speaker. He became Lucini's public face. In exchange, Lucini insisted on exclusive rights and confidentiality.

11.    At great expense, Lucini also commissioned marketing firms using psychological research techniques to create a marketing plan to target both emotional and intellectual responses from consumers. Lucini engaged in traditional and non-traditional advertising and promotion and refined its marketing message. Lucini shared the results of its extensive research as well as its business plans with Defendants; it did not disclose its plans or the results of its studies with anyone who was not working for Lucini or subject to a confidentiality agreement. In total, Lucini spent more than a million dollars in research and development and other expenses before selling its first bottle of olive oil.

12.    After making its first sale of its Lucini Premium Select product in August 1998, Lucini worked to create a brand identity and market the product into the specialty and grocery stores it had targeted. Lucini's efforts paid off. According to A.C. Nielsen's Olive Oil Item Rating Report, in less than five years, Lucini has become the number three (of 40) selling brand of premium olive oil in the United States.

## D. The LEO Project

13. In early 1998, Lucini and Grappolini discussed adding a line of extra virgin olive oils blended with "essential oils" (*i.e.*, natural extracts such as lemon or garlic). Grappolini agreed to be primarily responsible for the food-related study (taste, smell) of the new products, and Lucini agreed to be responsible for the advertising, distribution, and marketing. They termed the project the "LEO Project," which stands for Lucini Essential Oils.

14. Lucini extensively researched the potential market for natural extract premium olive oil products by empaneling focus groups and commissioning other studies. These studies analyzed all elements of packaging, product positioning, label colors, label textures, language and titles. In March of 1998, Lucini received a very strong positive response to the products and was eager to move quickly to develop and market this new product.

15. In a March 11, 1998 letter to Mr. Frigo, Grappolini enthused that he was "really happy to hear that you received a strong interest in the essential oil . . . I know that Renee [Frigo] and Daniel [Graeff] told you how much I desire to put my energy in this project." (Px 43).

16. Grappolini ostensibly did put his energy into the LEO project. He attended meetings in Chicago concerning the LEO project in the summer of 1998. Grappolini told the Frigos about the "only" company in Italy that could supply Lucini with the quantity and quality of natural essential oils Lucini would need. This company, Vegetal-Progress s.r.l.

("Vegetal"), was run by the Perotti family. Subsequently, Lucini did its own extensive research looking for an alternative supplier of essential oils, but could find no company in Italy other than Vegetal that was capable of producing the superior product Lucini sought and the variety of flavors needed.

## E.     Lucini's Efforts To Obtain an Exclusive Supply Agreement With Vegetal

17.     In the summer of 1998 Lucini asked Grappolini to approach Vegetal on Lucini's behalf and propose an exclusive worldwide supply arrangement. Although Grappolini told Renee Frigo that he did not believe Vegetal would ever consider an exclusive arrangement with anyone, he agreed to ask Vegetal for an exclusive contract on Lucini's behalf. Lucini explained that it could make the capital commitment necessary to finance the LEO project only if it knew that Vegetal had agreed to an exclusive relationship for the supply of its essential oils for use in the olive oil industry. Lucini explained to Grappolini that exclusivity was crucial for the LEO project. Lucini could not justify the start-up costs necessary to bring this new and unique product to market and to create consumer demand if, after Lucini had succeeded in creating the demand for the product, the Perottis were free to switch their supply of essential oils to one of Lucini's competitors. Lucini did not seek to limit Vegetal from supplying its essential oils to other industries such as perfumes and cosmetics.

18.     In the summer of 1998, Grappolini reported back to Lucini that he had a very positive response from his meeting with the Perottis. He stated that Vegetal was uniquely equipped—from technical and quality standpoints—for the LEO project. On August 8, 1998,

he further reported that the Perottis "will work with us exclusively and are ready to sign a contract stating as much." (Px 61). Renee Frigo told Grappolini to have the Perottis send them a contract they had used in the past, and they would work with it.

**F.     Grappolini Misleads Lucini About the Status of the Vegetal Negotiations**

19.     Grappolini attended a meeting in Chicago in December 1998 to further discuss and plan the LEO project.  In addition, Grappolini regularly communicated by telephone and fax with Lucini as the project moved forward.  Lucini spent hundreds of thousands of dollars testing flavors, designing labels and packaging, creating recipes for the new products, determining a pricing strategy, selecting the types of essential oil products that would be best sold in grocery stores, speciality stores, and to those in the food service industry, and testing everything in focus groups.  As it had with Lucini Premium Select, Lucini shared its results with Defendants and regularly included Mr. Grappolini in high level discussions of strategy and plans.  Lucini included Grappolini in meetings to discuss feedback regarding its products from world-renowned chef Charlie Trotter (whose company signed a non-disclosure agreement). Chef Trotter advised Lucini on potential flavor possibilities for the LEO products for the line of products Lucini intended to market to the food service industry (the chef's line) as well as for the lines of products Lucini intended to market in specialty stores (the gourmet line) and grocery stores (the grocery line).

20.     In December 1998, Grappolini wrote to Arthur Frigo, Renee Frigo, and Daniel Graeff that Vegetal wanted Lucini to provide a draft "world exclusive" contract as soon as possible. (Px 72). The same day, Lucini wrote back that it would begin to draft an agreement. (Px 73). On February 24, 1999, Renee Frigo wrote to Marco Milandri, Grappolini's assistant, stating, "We are ready with the essential oil agreement for Mr. P . . . family's company. Let me know if Mr. Grappolini would like it sent to him to give to Mr. P or if he would like us to fax it directly." (Px 76). Mr. Milandri wrote back that Grappolini would prefer to personally deliver the agreement to the Perottis because he has the relationship with Mr. P. (Px 77). Mr. Milandri testified that Mr. Grappolini had specifically directed him to make this response. (Px 302, pgs. 145-46). Later that day, Renee Frigo faxed a draft agreement to Mr. Grappolini with the cover note: "I have attached the Essential Oil Agreement for you to present on Lucini behalf to Mr. Perotti." (Px 78). The attached supply agreement described a worldwide exclusive supply arrangement between Vegetal and Lucini. *Id.*

21.     After February 1999, Mr. Grappolini indicated to Lucini that he had presented the contract to Vegetal and stated, on numerous occasions, that it was only a matter of time before he would have the supply contract signed by Vegetal. He indicated that any delays were due to Vegetal's need to run the proposed agreement past its French parent company. Mr. Grappolini's representations to Lucini were not true. At his deposition, Mr. Grappolini admitted that Lucini had asked him to present the contract to Vegetal, that he had never done so, and that he never told Lucini of his failure to transmit the contract. (Px 303, pgs. 23-27).

22.     In May of 1999, Arthur Frigo, Renee Frigo, Daniel Graeff, and Grappolini met with the Perottis.  Before the meeting, Grappolini cautioned the Frigos not to mention the proposed supply agreement with Vegetal.  He stated that since it was their first meeting, the Perottis would be offended by such an American and aggressive approach.  Grappolini reassured the Frigos that he would take care of the business issues with the Perottis.  Once again, Lucini relied on Grappolini's advice.  After the meeting, Giorgio Perotti wrote to Renee and Daniel, "expressing great confidence in [their] enterprise, which aim is to link to the qualities of the olive oil the numerous and suggestive qualities of the essential oils." (Px 89).

23.     As time went by and Lucini spent more and more money developing its flavored oil products, Grappolini continued to reassure Lucini that he would obtain the Vegetal contract for Lucini.

24.     From March to October 1999, Grappolini met nearly every month for extensive, multiple day meetings with Arthur and Renee Frigo, Daniel Graeff, and Lucini's designer, Milana Kosovac, concerning the LEO Project.  During the meetings, which took place in Chicago, New York, Miami, Loro Ciuffenna, and Lake Como, as well as through confidential correspondence, the Frigos explained to Grappolini in detail Lucini's confidential and trade secret marketing and design strategies, research results and analysis concerning the LEO Project.  This information included:

(a)  Lucini's targeted marketing strategy for specific sales venues;

(b)  Lucini's research into consumer profiles in different sales venues;

(c)  Lucini's specific plans for introducing new single flavor and combination LEO products in different venues;

(d)  Lucini's testing data and analysis of bottle, package and label design features to determine which elements would maximize the chances that first-time customers would pick Lucini's products off the shelf;

(e)  Lucini's advertising strategy and techniques to establish and maintain a "brand" identity and image;

(f)  Lucini's research into consumer acceptance of different flavors; and

(g)  Lucini's pricing strategy.

25.  The information and plans Lucini shared with Grappolini were not shared with anyone outside of Lucini's senior management, its designer, and Grappolini. As Lucini's designer, Ms. Kosovac had signed an agreement specifying that information shared by Lucini would remain strictly confidential. Lucini maintained its marketing, product development and design information as a closely guarded secret because it believed this information would give it a competitive advantage when it began selling LEO products, so long as it was unknown to Lucini's competitors. By the end of 1999, Lucini had spent over $800,000 developing the market information, researching packaging and sales possibilities and generating its trade secrets for the new LEO products. (Px 402).

26.  Lucini's extensive expenditures preparing its LEO products for market made good business sense to Lucini based on its sales forecasts for the products. On its grocery line

of LEO products, Lucini conservatively forecast sales of at least $1.2 million in its first full year; at least $2.1 million in its second full year; at least $2.5 million in its third full year, and at least $5.0 million in its fourth full year. (Px 401). Lucini anticipated profits of at least $4.17 million on the grocery line over its first four years. Lucini anticipated additional sales and profits on its gourmet and chef's lines of LEO products, but does not have contemporaneous sales forecasts for these products. Lucini's forecast are conservative, reasonable and credible. They are validated by the fact that Lucini did similar forecasts for its Lucini Premium Select product and for its vinegar products and exceeded its forecasts during the initial years the products were sold. If Lucini gains access to Vegetal essential oil or an alternative supply source immediately, it will be able to launch its products in early 2004, but not sooner, based on the fact that the olive harvest for 2003 has already concluded and Lucini cannot obtain sufficient quantities of the necessary base oil at this time to fill orders for 2003. Defendants have sold olive oil flavored with Vegetal essential oils since some time in 1999 under several different brand names but refused to disclose in discovery their total sales or profits from these products. The Court draws the inference from Defendants' refusal to disclose their actual sales experience with the product lines that Defendants' sales and profits meet or exceed those forecast by Lucini.

## G. Defendants Strike Their Own Deal With Vegetal, Shutting Out Lucini.

27. In direct contravention of his representations and Lucini's reasonable expectations, Grappolini secretly negotiated an exclusive, worldwide supply contract with

15

Vegetal for the Grappolini Company, rather than for Lucini. Grappolini never told Lucini that he was negotiating his own deal with Vegetal. The Grappolini-Vegetal agreement was signed on October 4, 1999. (Px 18 and 19). The Grappolini-Vegetal contract expressly prohibited any assignment of the contract to any third party, including Lucini. (Px 19, Art. 12).

28. After entering into his own exclusive arrangement with Vegetal, Grappolini deliberately hid that fact from Lucini. Grappolini continued to represent to Lucini that Lucini would soon have a worldwide exclusive contract with Vegetal. On October 4, 1999, the very day on which the Grappolini Company entered into its exclusive agreement with Vegetal, Renee Frigo and Daniel Graeff were in Italy to finalize details of the LEO Project. During that trip, Mr. Grappolini met with Renee Frigo and Daniel Graeff in Loro Ciuffenna to review labels for the LEO project, discuss Lucini's marketing plans, and conduct tastings. When Renee and Daniel reminded Grappolini of the importance of a direct supply agreement between Lucini and Vegetal, Grappolini responded, "Do not worry." Mr. Grappolini continued in his deception in mid-October 1999, during a day-long meeting about the LEO project, Grappolini told Arthur Frigo, "Do not worry. The Perotti agreement is going to be done in the next 30-45 days. I will have it for you. No problem. Do what you got to do." (Tr. 85). Mr. Grappolini's statements were false and intended to mislead Lucini into continuing to spend money on LEO, to continue sharing its trade secrets with Grappolini, and to continue paying Grappolini his monthly consulting fee even though he had begun to work exclusively for his own interests instead of for Lucini.

29. Because Lucini was nearing its planned launch of the LEO products at the important Fancy Food Show in San Francisco in mid-January 2000, Arthur Frigo insisted on knowing the status of the Vegetal negotiations by mid-October 1999. Mr. Frigo further reminded Grappolini that if the Lucini/Vegetal agreement was not executed within 30-45 days, then Lucini would be in serious risk of ruining its credibility with its customers (some of whom had committed to purchase the product sight unseen based on Lucini's reputation). Again, Grappolini insisted that everything was on track and reassured Frigo that he should not be concerned.

30. On or about November 5, 1999, in reliance on Grappolini's reassurances and representations, Lucini placed an order for LEO products from Grappolini, to be delivered in Chicago on February 21, 2000 and delivered to Lucini's warehouse in San Francisco on February 28, 2000. Grappolini indicated that he would fill this order using Lucini Premium Select oil and essential oil that Vegetal had agreed to provide pursuant to the anticipated exclusive supply arrangement with Lucini. Lucini paid the Grappolini Company $28,000 for the essential oils in anticipation of the contract. Lucini planned to use the LEO products to fill advance customer orders it would take at the Fancy Food Show and to begin its efforts to have the products distributed to stores around the country.

**H. Lucini Discovers the Truth**

31. On November 9, 1999, Daniel Graeff met with Grappolini in Italy in connection with negotiations over a potential expanded role for Mr. Grappolini with Lucini as it added

17

more product lines. Because Lucini's offer to expand Grappolini's role and nearly double his monthly compensation was explicitly contingent on securing for Lucini the worldwide exclusive contract with Vegetal, Mr. Graeff questioned Mr. Grappolini about the status of the Vegetal negotiations. Under direct questioning from Daniel Graeff, Grappolini admitted that he had already entered into an agreement with Vegetal for himself and his company, but refused to elaborate on the terms of the contract. Graeff expressed shock and disbelief, and immediately informed Arthur and Renee Frigo of the news.

32.     Lucini made repeated requests to Defendants to immediately provide Lucini with a copy of the agreement between the Grappolini Company and Vegetal. Nevertheless, Grappolini did not provide a copy of this agreement to Lucini's Italian counsel until December 21, 1999. At this point, Lucini learned for the first time that the Grappolini Company's contract with Vegetal was not assignable and that Grappolini did not intend to transfer the contract to Lucini.

33.     Following its discovery of the terms of the Grappolini-Vegetal contract, Lucini contacted the Perottis to explore whether there was any possibility of achieving a direct supply arrangement. Mr. Perotti told Renee Frigo and Daniel Graeff that Vegetal had no objection to supplying essential oil for use in Lucini's LEO products, and acknowledged that Grappolini was a "bad boy" in procuring the contract for his own company rather than Lucini, but Vegetal would not renege on its existing commitments to Mr. Grappolini. (Tr. 228). But for Grappolini's unlawful activities in entering into an exclusive arrangement with Vegetal for

18

his company, Lucini would have been able to enter into an exclusive supply arrangement with Vegetal.

34.    Because the olive harvest had concluded by the time Lucini discovered Grappolini's actions, it was too late for Lucini to find an alternative source for its Premium Select Olive Oil for the coming year, so Lucini continued doing business with Grappolini for a few months while it began investigating its alternatives.  When all discussions with Defendants' representatives seeking a negotiated solution broke down in June 2000, Lucini terminated its consulting and supply agreements with Grappolini and the Grappolini Company. (Px 126 and 127).  In his letter terminating the Consulting Contract, Arthur Frigo informed Mr. Grappolini that Lucini was terminating the agreement "due to the repeated violation of your fiduciary duties toward our company." (Px 127).  Mr. Frigo specifically noted that a basis for the termination was Mr. Grappolini's bad faith during negotiations over the Vegetal contract.

## I.    Defendants Compete with Lucini Using Vegetal Essential Oil and Lucini's Trade Secrets

35.    Unbeknownst to Lucini, Defendants began selling their own products blending extra virgin olive oil with essential oils as early as 1999.  Defendants first marketed their products in Italy and later expanded their sales to the United States, Sweden, Denmark, England, and other parts of Europe. (Px 10, 12, 141, 146, 150).  Defendants marketed their products under various names, including Res Essenziale, Cuoco, Ortoliva, Ortointavola, and under the Grappolini name.

36.     In the United States, the Grappolini Company sold single flavor products in specialty stores, Liberty Heights Fresh and Sur La Table. Lucini had planned to sell its single flavor gourmet line in specialty stores. Grappolini knew of Lucini's plans to sell its single flavor gourmet line in specialty stores, including Sur La Table, and its combination flavor products in grocery stores, and knew that Lucini made this distinction based on testing and research.

37.     Grappolini's flavors consisted of Basil, Rosemary, Garlic, Lemon and Orange. (Px 12 and 139). Lucini's gourmet line had included each of these flavors. Lucini had determined the most promising flavors by testing a wide variety of possibilities with essential oils purchased from Vegetal. Prior to receiving access to the results of Lucini's market research, Mr. Grappolini had believed that the most promising flavors for the essential oil products included rose, lavender, and mint, but not lemon. Lucini's research disclosed that basil, rosemary, garlic, and lemon were more likely to be successful than the flavors Mr. Grappolini had preferred. Mr. Grappolini was told the results of Lucini's research on flavor preferences.

38.     Lucini spent several months working with Grappolini to determine the ideal percentage of essential oil that should be blended into extra virgin olive oil. In conducting tests to make this determination, Lucini paid Mr. Grappolini his monthly consulting fee as compensation and paid for all of the essential oils that were used in the tests. Lucini's testing specifically determined the correct percentage of essential oil to use for each of the flavors

the Grappolini Company sold. Mr. Grappolini was privy to all of the formulations and used them in creating his own flavored olive oil products.

39.    In marketing its essential oil products in the United States, the Grappolini Company offered a selection of each of its flavors in a single box containing sample size bottles of the oil. In addition, the Grappolini Company sold larger single bottles of each flavor, again packaged within a box. In both instances, the box featured a window through which a customer could see the color of the oil and looking through the window and through the bottle could see an image behind of an olive or the flavor source on a value-added package insert. This packaging configuration is exactly what Lucini had designed for its own LEO trial pack and had communicated to Grappolini.

40.    On both the Res Essenziale packaging and the Grappolini brand packaging, the Grappolini company used hand drawn images of the flavor source (*e.g.* garlic, rosemary, basil, lemon) strikingly similar to what Lucini planned to use on its grocery line. Mr. Grappolini had received each of Lucini's images digitally on a computer disk. On the Grappolini brand products, Defendants used the images on a clean white background in a manner that mirrors Lucini's planned labels for its gourmet line. Lucini's selection of its label designs was based on extensive and expensive testing of over 300 candidate labels with focus groups and analyzing the results in the context of demographic information Lucini gathered; Grappolini's selection of his label designs came after reviewing Lucini's selections and learning the results of Lucini's research. Lucini had considered and weighed the possibility of using images

depicting product use or what familiar foods the product would enhance before determining that product composition should be depicted in the label image; Grappolini reached the same conclusion for his own products after learning of Lucini's research.

41.     Lucini determined that flavored olive oil products would sell better in smaller bottles than the bottles used for unflavored extra virgin olive oil. This was based on pricing considerations and how quickly it was determined an average consumer would finish a bottle of each respective product. Grappolini was told of Lucini's conclusions. Just as Lucini had planned to use a smaller bottle for its LEO products, Grappolini sold his essential oil products in bottles smaller than those he typically used for unflavored products.

42.     Lucini determined that its LEO products should be sold at a single common price, even though the costs of the raw material essential oil varied from flavor to flavor. Such a pricing plan would eliminate potential customer confusion and maximize sales. After learning of Lucini's pricing plan, Grappolini set the prices for his own essential oil products at a common price, without regard to the costs of producing each respective flavor.

43.     Lucini determined that in order to win new customers for an unfamiliar product, it was important to include value-added inserts containing recipes and instructions for how to use the product. Lucini hired and worked with chefs to create the recipes and shared its conclusions with Grappolini. Again, Grappolini's U.S. essential oil products contain recipes and instruction on how to use the products.

44.     Lucini went through hundreds of drafts of the text for its labels and advertising

materials for its LEO products. (See e.g. Px 168-70, 175, 184 and 214). It based these drafts

on its market research and tested these drafts in focus groups before deciding on the most

effective messages to deliver and the descriptive terms that would best capture the interest of

potential consumers. It shared with Mr. Grappolini many of the draft labels and told him of

the messages it wanted to deliver. The product literature of both Lucini and the Grappolini

Company refer to the "marriage" of extra virgin olive oil with essential oils; both emphasize

"natural aromas" and make liberal use of the descriptive terms "fresh," "organic," and

"natural;" both refer to "mountain" pepper; Lucini's refers to capturing the "peak of

freshness" and the "tastes of the harvest season" while Grappolini's emphasizes "freshness"

and "flavor" and states his product "solves the problem of finding quality fresh ingredient

only when they are in season;" both encourage the consumer to "pour" or "drizzle" the oil

over the "finished dish."

45.     For the products Lucini planned to use to introduce its U.S. customers to

essential oil products, it determined that using label coloring and design to create a

parchment-like, old-world feel evoked positive responses from grocery store consumers and

others new to the product's uses. It used this effect on both the boxes and labels of its original

grocery line products. The boxes, the labels, and the reasoning behind them was shared with

Grappolini. When Grappolini first introduced his original U.S. product, he elected to use his

own parchment-like coloring and design effect. Lucini determined that white labels and black

bottles have an impact on gourmet purchasers, and Grappolini used this coloring scheme in Sweden when he sold to sophisticated gourmet store Zeta.

46. While Lucini told select customers of its plans to sell a superior form of flavored olive oil not before sold anywhere in the world, Lucini told no one, outside of its trusted consultants and employees, of its plans to use Vegetal Progress as the key supplier of essential oil for this line of products. Lucini knew that if this information were disclosed to its competitors, this might have required it to pay more to sign Vegetal to an exclusive contract or it might lose its anticipated competitive advantage of being first to market with the new product.

47. Lucini spent in excess of $800,000 developing the marketing, design, and product development information it shared with Grappolini. It treated this information as secret and did not share it with anyone else. The Grappolini Company's bookkeeper, Morena Botti, testified that she could not identify any funds her company had spent on research and development in connection with its essential oil products. (Px 301, p. 37). Mr. Grappolini testified that he never paid money to anyone to conduct any research, that he alone was responsible for selecting the flavors used by his company, for selecting the messages to be delivered in his product labels, for selecting the images to be conveyed on the labels, and for designing the window box packaging. (Px 303, pgs. 101-05, 225). Based on his knowledge of Lucini's research and other confidential information, Mr. Grappolini was able to make more informed decisions about how to formulate and market his products than he would

otherwise have been able to do without a significant expenditure of money. (Px 303).

48.    Lucini would not have been willing to share its confidential information with a competitor for any price, particularly before it had secured an exclusive supply contract with Vegetal and brought its products to market. With regard to the identity of Vegetal as its key supplier, Lucini is unlikely to have disclosed the information for a fee of anything less than its anticipated profits on its LEO products over some years. With regard to its formulation, design, and packaging information, the Court finds that a reasonable royalty would be at least the substantial sum Lucini spent developing the information.

49.    The Lucini trade secrets that defendants have used and will continue to use in the future, unless permanently enjoined, unfairly erode Lucini's competitive position in the market and limit the benefit Lucini can achieve from its investment in market, product formulation and design research. Unless permanently enjoined, Defendants will continue to improperly use Lucini's trade secrets.

## J.    The Private Label Threat

50.    Despite a large investment in time and money studying its competition, Lucini is not aware of any product sold in the United States with a flavor profile identical to Lucini Premium Select extra virgin olive oil.

51.    Without knowledge of Lucini's confidential methods for creating its oil, it would be difficult, if not impossible, for a competitor to duplicate Lucini Premium Select without a large investment of time and money.

52. Lucini's competitive position in the premium extra virgin olive oil market is enhanced by the uniqueness of its popular product. If Lucini Premium Select were to become one of several copycat oils, the damage to Lucini's reputation and market position would be irreparable.

53. Several of Lucini's customers sell private label extra virgin olive oils. Although Lucini's customers list (including some 13,000 stores) is maintained as confidential by Lucini and has not been shared outside the company, Lucini disclosed the identity of its largest and most important customers to Grappolini while he was acting as a consultant subject to multiple confidentiality agreements. Sur La Table has been one of Lucini's major customers.

54. After Lucini terminated Grappolini's consulting contract in June 2000, Grappolini met with Sur La Table and admits he discussed creating a private label extra virgin olive oil for that chain of stores. (Px 303, pgs. 234-35). The flavor profile of the oil Grappolini proposed private labeling for Sur La Table was described in terms matching the flavor profile Grappolini developed with Lucini for its Premium Select flagship product.

55. Unless permanently enjoined, Defendants will use or disclose Lucini's secret methods for producing its Premium Select product.

K.    **Affirmative Defenses**

56. Defendants offered no evidence at trial in support of their affirmative defenses. Defendants have failed to meet their burden to establish sufficient facts to support their affirmative defenses. Going further, the Court finds that there is no evidence in the record

26

supporting a finding of *res judicata* or collateral estoppel. The Court will discuss the issue of preemption in the Conclusions of Law.

### L.    Defendants Acted Willfully and Maliciously

57.    Defendants acted in a willful and malicious manner to misappropriate Lucini's trade secrets and corporate opportunities. They acted to intentionally misappropriate and use Lucini's trade secrets for their own financial gain in conscious disregard for Lucini's right to protect and preserve its trade secret information and in conscious disregard for their duties as an agent to Lucini.

## II. CONCLUSIONS OF LAW

### A.    Jurisdiction

58.    The Court has jurisdiction over this diversity action under 28 U.S.C. § 1332.

### B.    Illinois Law Applies

59.    The parties do not dispute that Illinois law applies. In this regard, the Court finds that Lucini developed its trade secrets primarily in Illinois, that Defendants received certain of Lucini's trade secret information in Illinois, and that Lucini's injury was suffered in Illinois. The June 1997 Non-Disclosure Agreement specifies that Illinois law applies. (Px 15, ¶ 6).

### C.    Breach of Fiduciary Duty - Count I

60.    To establish a claim for breach of fiduciary duty, Lucini must prove: (1) the existence of a fiduciary duty on the defendant's part, (2) the defendant's breach of the duty,

27

and (3) damages proximately resulting from the breach. *Neade v. Portes*, 193 Ill. 2d 433, 444, 739 N.E. 2d 496, 502 (2000); *Romanek v. Connelly*, 324 Ill. App. 3d 393, 404, 753 N.E.2d 1062, 1072 (1st Dist. 2001).

61.    An "agency relationship engenders a type of fiduciary affiliation in which the principal has the right to control the agent's conduct, and the agent has the power to act on the principal's behalf.  Once an agency relationship is found, a fiduciary relationship arises as a matter of law." *Kirkruff v. Wisegarver*, 297 Ill. App. 3d 826, 830, 697 N.E.2d 406, 410 (4th Dist. 1998).  "The existence of an agency relationship constitutes a question of fact for the trier of fact." *Id.* As agents, Defendants owed Lucini general duties of good faith, loyalty, and trust. *Kirkruff*, 297 Ill. App. 3d at 832, 697 N.E.2d at 411.  In addition, Defendants owed Lucini "full disclosure of all relevant facts relating to the transaction or affecting the subject matter of the agency."  *Id.*

62.    Defendants were Lucini's agents and owed Lucini a fiduciary duty to advance Lucini's interests, not their own.  When Defendants obtained an exclusive supply agreement with Vegetal for the Grappolini Company instead of for Lucini, they were disloyal and breached their fiduciary duties. Lucini suffered substantial damages as a result of this breach.

63.    As a proximate result of Defendants' breach of their fiduciary duties, Lucini suffered lost profits damages of at least $4.17 million from selling its grocery line of LEO products from 2000 through 2003.

64.     Punitive damages are appropriate where the defendant has intentionally breached a fiduciary duty. *Obermaier v. Obermaier*, 128 Ill. App. 3d 602, 610, 470 N.E.2d 1047, 1053 (1st Dist. 1984); *see also O'Neill v. Gallant Ins. Co.,* 329 Ill. App. 3d 1166, 1177, 769 N.E.2d 100, 109 (5th Dist. 2002) (stating that "Illinois courts are not hesitant to award punitive damages in cases where there has been a flagrant breach of fiduciary responsibility"). Defendants' breach of their fiduciary duties was flagrant and intentional. Defendants deliberately usurped a corporate opportunity sought by Lucini, which Lucini had entrusted Defendants to secure on Lucini's behalf. Although Defendants explicitly accepted this trust and ensured Lucini that Mr. Grappolini and his company would do as Lucini requested, Defendants failed to do so and hid this fact from Lucini. A punitive damage award of $1,000,000 against Defendants is appropriate in order to punish Defendants and to deter Defendants from committing similar acts in the future.

## B.     Fraud - Count III

65.     In its claim for common law fraud, Lucini must prove: (1) the defendant made a statement, (2) the statement was material in nature, (3) the statement was untrue, (4) the defendant knew it was untrue or made the statement with culpable ignorance of its truth or falsity, (5) the statement was made for the purpose of inducing the plaintiff's reliance, (6) the statement was actually relied upon by the plaintiff, and (7) the plaintiff suffered injury as a result. *Small v. Sussman,* 306 Ill. App. 3d 639, 646, 713 N.E.2d 1216, 1221 (1st Dist. 1999).

29

66. Defendants committed fraud when Guiseppe Grappolini falsely told Lucini that he had delivered Lucini's draft contract to Vegetal and when he told Lucini that Vegetal had agreed to enter into a worldwide exclusive agreement with Lucini. These statements were material, known by Defendants to be untrue when made, made to induce reliance by Lucini, actually induced Lucini's reliance, and caused injury to Lucini.

67. While a claim of fraud ordinarily cannot be sustained in connection with a forecast or forward looking statement, the Illinois Supreme Court has recognized that false promises or representations of future conduct is actionable as promissory fraud if made in furtherance of a fraudulent scheme. *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill. 2d 145, 168, 545 N.E.2d 672, 682 (Ill. 1989); *Bensdorf & Johnson, Inc. v. Northern Telecom Ltd.,* 58 F. Supp. 2d 874, 881 (N.D. Ill. 1999) (accepting promissory fraud claim "where a plaintiff is able to show that the misrepresentations are part of a 'scheme to defraud'").

68. "Where a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where that other party relies upon it to his detriment, the false promise will be considered an intended scheme to defraud the victim and will be actionable." *Concord Indus., Inc. v. Harvey Indus. Corp.,* 122 Ill. App. 3d 845, 849-50, 462 N.E.2d 1252, 1255 (1st Dist. 1984).

69. In promising Lucini that they would secure an exclusive worldwide supply arrangement with Vegetal, while never intending to do so because Mr. Grappolini wanted

such an arrangement for his own company, Defendants committed promissory fraud. Because Lucini has established that Defendants' fraud was in furtherance of a scheme to beat Lucini to market and unlawfully compete, Lucini has met its burden of proving promissory fraud.

70.     But for Lucini's reliance on defendant's false statements, it would have directly sought a worldwide exclusive supply arrangement with Vegetal. Vegetal would have willingly entered into such an arrangement with Lucini on at least the same terms as the contract it entered into with the Grappolini Company. As a result of Defendants' fraud and promissory fraud, Lucini has suffered damages in the amount of its lost profits on LEO products.

71.     In seeking to recover punitive damages on its fraud claim, Lucini must show in addition to simple fraud, "gross fraud, breach of trust, or other extraordinary or exceptional circumstances clearly showing malice and willfulness." *Jannotta v. Subway Sandwich Shops, Inc.*, 125 F.3d 503, 511 (7th Cir. 1997) (internal quotations omitted). "One way to satisfy that standard is through evidence indicating that a fraud was designed to enrich the defendant without regard to its effect on others or was intended by him to harm the plaintiff." *Id.*; *see also Los Amigos Supermarket, Inc. v. Metro. Bank and Trust Co.*, 306 Ill. App. 3d 115, 129-30, 713 N.E.2d 686, 696 (1st Dist. 1999) (holding punitive damages may be awarded where the wrongful act committed by the defendant is characterized by wantonness, malice, oppression or other circumstances of aggravation as well in a fraud action where false representations are wantonly and designedly made).

72.     Defendants were willful and malicious in making statements to induce Lucini to believe they were working on Lucini's behalf to secure the Vegetal contract. Defendants' fraud was designed to enrich themselves without regard to the harm it would inflict on Lucini. Defendants' misrepresentations were wantonly and designedly made to cheat Lucini for their own benefit. Lucini is entitled to an award of $1,000,000 in punitive damages to punish Defendants and to deter them from engaging in such conduct in the future.

## C.     Promissory Estoppel - Count IV

73.     A claim for promissory estoppel must establish: (1) the defendant made an unambiguous promise, (2) the plaintiff relied on the promise, (3) the reliance was expected and foreseeable from the defendant's perspective, and (4) the plaintiff's reliance on the promise was detrimental. *Pickus Construction and Equip. v. Am. Overhead Door,* 326 Ill. App. 3d 518, 523, 761 N.E.2d 356, 361 (2nd Dist. 2001).

74.     Defendant Giuseppe Grappolini promised that he would deliver to Lucini an exclusive worldwide supply contract with Vegetal. This promise was unambiguous and clearly within Defendant's power to carry out based on the assurances he had received from Vegetal and the fact that he was ultimately able to secure just such a contract for his own company. Lucini relied on this promise and spent hundreds of thousands of dollars preparing its products for market based on the promise. Lucini also accepted commitments to order its LEO products from its customers based on Defendants' unambiguous promises that they would deliver the Vegetal contract and the LEO product in time for the 2000 San Francisco

Fancy Food Show. Lucini's reliance was expected and foreseeable to Grappolini and his company and worked to the detriment of Lucini.

75.     The presumptive measure of damages for promissory estoppel is the value of the promise. *Goldstick v. ICM Realty*, 788 F.2d 456, 464 (7th Cir. 1986). However, Illinois courts do allow a plaintiff in a promissory estoppel case to recover damages for the profits it would have made had the defendant kept his promise—provided it was necessary to do justice to the plaintiff. *Id.* at 463. This is such a case because the value of the Vegetal contract is directly related to Lucini's business plan for its LEO project. Accordingly, this Court awards Lucini its lost profits of $4,170,000 on its promissory estoppel claim.

## D.     Illinois Trade Secret Act - Count VI

76.     To establish a misappropriation of a trade secret, a plaintiff must prove: 1) the existence of a trade secret, 2) misappropriation of the secret information, and 3) that the secret information was used in the defendant's business. *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265-66 (7th Cir. 1992).

### Trade Secrets

77.     The Illinois Trade Secret Act defines a "trade secret" as "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value

from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). A plaintiff must prove that the true value of the information lies in the fact that it is not generally known to others who could benefit from using it, and that it made reasonable effort to maintain secrecy. *Mangren Research & Dev. Corp. v. National Chem. Co., Inc.*, 87 F.3d 937, 942, 943 (7th Cir. 1996).

78.     Whether the information sought to be protected qualifies as a trade secret focuses fundamentally on the secrecy of such information. *Thermodyne Food Serv. Products, Inc. v. McDonald's Corp.*, 940 F. Supp. 1300, 1304 (N.D. Ill. 1996) (*citing Mangren*, 87 F.3d at 942); *see also Stampede Tool Warehouse, Inc. v. May*, 272 Ill. App. 3d 580, 588, 651 N.E.2d 209, 215 (1st Dist. 1995) (stating that the key factor to establishing secrecy "is the ease with which the information can be readily duplicated without involving considerable time, effort or expense"); *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 874 (N.D. Ill. 2001) (finding customer information not readily available from any source of public information to be a trade secret).

79.     The following factors are significant in determining whether a trade secret exists: (1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which the information is known by the employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff and to the plaintiff's

competitors; (5) the amount of effort or money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *ILG Indus., Inc. v. Scott*, 49 Ill. 2d 88, 93, 273 N.E.2d 393, 396 (1971); *Strata Mktg., Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1068, 740 N.E.2d 1166, 1177 (1st Dist. 2000) (stating that a customer list can be a trade secret if it takes considerable effort, time, and money to compile).

80.     Information meeting the Illinois Trade Secret Act "secrecy" criterion may include customer lists that are not readily ascertainable, pricing distribution and marketing plans, and sales data and market analysis information. *RKI,* 177 F. Supp. 2d at 873.

81.     Lucini's research, design and marketing plans, product formulations and production methods, and customer and supplier identities meet the secrecy requirement of the Illinois Trade Secret Act.  Such information is not readily ascertainable from any source of public information, was developed through great expense and effort, and was not shared with anyone outside of Lucini's senior management, except for a few select individuals who were assisting Lucini and who were subject to non-disclosure agreements.  Lucini took reasonable steps to safeguard its confidential information.  *See Service Centers of Chicago, Inc. v. Minogue*, 180 Ill. App. 3d 447, 453-54, 535 N.E.2d 1132, 1136 (1st Dist. 1989).  Further, the information would be extremely valuable to Lucini's competitors, as it has been to the Grappolini Company.  Lucini's trade secrets derive a substantial part of their value from being known to Lucini and not its competitors.  If Lucini's competitors were to have access to

35

Lucini's information, it would give them an unfair competitive advantage over Lucini because (i) they would know Lucini's plans and strategies while Lucini would not know theirs, (ii) they would be able to utilize detailed knowledge of the market and consumer preferences without incurring the cost of obtaining such information from studies and research, and (iii) they would be able to anticipate and undercut the effectiveness of Lucini's market and design schemes.

## Misappropriation by Defendants

82.     The Illinois Trade Secret Act defines "misappropriation" as:

(1)     acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or

(2)     disclosure or use of a trade secret of a person without express or implied consent by another person who:

(A)     used improper means to acquire knowledge of the trade secret; or

(B)     at the time of the disclosure or use, knew or had reason to know that knowledge of the trade secret was: (I) derived from or through a person who utilized improper means to acquire it; (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C)     before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

765 ILCS 1065/2(b). The Act further specifies that improper means of acquiring a trade secret include "breach of a confidential relationship or other duty to maintain secrecy or limit use." 765 ILCS 1065/2(a).

## Defendants' Use of Trade Secrets

83.    The user of another's trade secret is liable even if he uses it with modifications or improvements upon it effected by his own efforts, so long as the substance of the process used by the actor is derived from the other's secret. *Mangren*, 87 F.3d at 944; *see also Thermodyne*, 940 F. Supp. at 1308 ("Although a product appears to be a new or modified product, a violation of the ITSA occurs if the modification or new product was substantially derived from another's trade secret."). The limited extent to which defendant modified Lucini's essential oil products and packaging to suit themselves does not change the fact that such products and packaging are substantially derived from Lucini's trade secret information.

84.    Defendants misappropriated Lucini's valuable trade secrets. Defendants acquired Lucini's trade secrets under circumstances giving rise to a duty to maintain their secrecy. Defendants' assistant Marco Milandri testified that he understood that Lucini's Premium Select and LEO product formulations were company secrets. Likewise, Grappolini testified that he understood the secrecy of trade secret information communicated to him. Indeed, his various contracts specified that he would maintain the confidentiality of Lucini's research conclusions. After Defendants had secretly secured their own exclusive supply contract with Vegetal, they hid this fact from Lucini in order to induce Lucini to continue

sharing its trade secret research, strategies, and plans with Grappolini.

85.    Lucini's decision to focus its LEO project around essential oils from Vegetal Progress was a closely guarded trade secret.  When Mr. Grappolini used this information on behalf of the Grappolini Company to allow it unfettered access to negotiate its own exclusive arrangement with Vegetal, it is necessary to conclude that the Grappolini Company "acquired" the information with full knowledge that: (i) Lucini had not consented to the use of the information by a competitor, and (ii) Mr. Grappolini had no right to transmit or use the information for his own purposes or on behalf of the Grappolini Company.

86.    Defendants also unlawfully misappropriated Lucini's trade secret information because it is inevitable, absent an injunction, that Defendants will use the information they obtained under a duty of secrecy in connection with their consulting and olive oil businesses. The inevitable use of Lucini's trade secrets would give defendants a substantial unfair competitive advantage over Lucini. *PepsiCo, Inc.,* 54 F.3d at 1269-70; *Strata Marketing, Inc.,* 740 N.E.2d at 1178 ("We believe *PepsiCo* correctly interprets Illinois law and agree that inevitable disclosure is a theory upon which a plaintiff in Illinois can proceed under the [Illinois Trade Secrets] Act").

87.    Lucini has established that the disclosure of trade secrets is inevitable by demonstrating: (i) that it is in direct competition with the Grappolini Company with respect to premium extra virgin olive oil and essential flavored olive oils, (ii) that within his company, Mr. Grappolini has responsibility for all product design, formulation, and marketing—the very

subject about which he received Lucini's trade secret information, and (iii) there are no steps the Grappolini Company has taken or could take to prevent Mr. Grappolini from using Lucini's trade secret information as he fulfills his duties to the Grappolini Company. *PepsiCo, Inc.,* 54 F.3d at 1269-70. As in the Seventh Circuit's *PepsiCo* case, by virtue of his position with the Grappolini Company, it is inevitable that Mr. Grappolini will use or disclose Lucini's trade secrets as his company competes with Lucini.

88.     Under the Illinois Trade Secret Act, "actual or threatened misappropriation may be enjoined." 765 ILCS 1065/3(a). "[W]here a statute expressly authorizes injunctive relief, a plaintiff need only show defendant's violation of the Act and that plaintiff has standing to pursue the cause. . . . The general rules of equity requiring a showing of irreparable injury and a lack of an adequate remedy at law need not be shown." *Illinois Bell Tel. Co. v. Lake County Grading*, 313 Ill. App. 3d 184, 189, 728 N.E.2d 1178, 1181 (2d Dist. 2000) (interpreting the Illinois Underground Utility Facilities Damage Prevention Act) (internal citations omitted). Thus, to the extent that Lucini's request for injunctive relief is based on Grappolini's violation of Lucini's trade secret, Lucini is not required to establish irreparable injury and a lack of adequate legal remedy.

89.     Alternatively, Lucini has established that it will suffer irreparable harm if a permanent injunction does not issue, that Lucini has no adequate remedy at law, that the injury to Lucini if injunctive relief does not issue would exceed any harm to Defendants if an injunction is entered, and that the public interest supports the issuance of an injunction.

*Chicago School Reform Bd. of Trustees v. Diversified Pharm. Serv., Inc.*, 40 F. Supp. 2d 987, 991 (N.D. Ill. 1999) (to obtain a permanent injunction, plaintiff must show: (1) actual success on the merits; (2) plaintiff does not have an adequate remedy of law or that it will suffer irreparable harm without the injunction; (3) the balance of harms between the parties favors entry of an injunction; and (4) entry of the injunction will not harm the public interest). The Court will issue an injunction to protect Lucini from the future use of its trade secret information. The damage award is inadequate because the LEO project could produce profits to Lucini for many years beyond the four years for which this Court has awarded damages. In addition, the damages have been conservatively computed.

90.     In addition to injunctive relief, Lucini is entitled to damages from the unauthorized use and disclosure of Lucini's trade secret information in addition to an injunction. *See RKI, Inc. v. Grimes*, 200 F. Supp. 2d 916, 926 (N.D. Ill. 2002). Under the ITSA,

> [d]amages can include both the actual loss caused by the misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. If neither damages nor unjust enrichment caused by the misappropriation are proved by a preponderance of the evidence, the court may award damages caused by a misappropriation measured in terms of a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

765 ILCS 1065/ 4(a). Actual damages can include lost sales as a result of the competitor's entry into a market, as well as price erosion. *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1119-20 (Fed. Cir. 1996).

91.     While Lucini's lost profits are necessarily uncertain, that poses no barrier to an

award of actual damages.  The United States Supreme Court has held on many occasions that

when a defendant's unlawful act keeps a plaintiff out of a market, specific and certain proof

of the actual amount of losses is not required.  *J. Truett Payne Co., Inc. v. Chrysler Motors

Corp.*, 451 U.S. 557, 565-66 (1981).  "Any other rule would enable the wrongdoer to profit

by his wrongdoing at the expense of his victim.   It would be an inducement to make

wrongdoing so effective and complete in every case as to preclude any recovery, by rendering

the measure of damages uncertain." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-

65 (1946); *see also Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555,

563 (1931) ("Where the tort itself is of such a nature as to preclude the ascertainment of the

amount of damages with certainty, it would be a perversion of fundamental principles of

justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making

any amend for his acts.").  In this case, Lucini has established its lost profits through credible

forecasts which would meet its ordinary burden of proof of establishing the amount of its lost

profit damages.  Alternatively, to the extent Lucini's lost profits are necessarily uncertain as

a result of Defendants' acts to keep Lucini out of the essential oil market, the Court finds that

Lucini has provided sufficient evidence to meet the lesser burden that is applicable to such

a situation.  Defendants' failure to disclose in discovery (much less, offer proof at trial) of

their own sales and profits from essential oil products leads the Court to draw the inference

that such information would support Lucini's forecasts.

92.     The Court will award Lucini its lost profits of $4,170,000, together with its $800,000 of development costs for LEO project.

## Punitive Damages

93.     "If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (a)." 765 ILCS 1065/4(b).    Willful and malicious misappropriation includes intentional misappropriation as well as "misappropriation resulting from the conscious disregard of the rights of another." *Mangren*, 87 F.3d at 946.  Defendants engaged in willful and malicious misappropriation as evidenced by their use of the information for directly competitive purposes and their efforts to hide the misappropriation and, accordingly, the Court will award $1,000,000 in exemplary damages.  Such an award is necessary to discourage Defendants from engaging in such conduct in the future.

## Attorney's Fees

94.     The Illinois Trade Secret Act authorizes an award of reasonable attorneys' fees to the prevailing party where willful and malicious conduct is found to have occurred.  765 ILCS 1065/5.  This is an appropriate case for an award of attorney's fees and computerized research in the total amount of $750,065.28 as set forth in Lucini's petition for attorney's fees and costs.  The Court finds the time and effort to be reasonable, the hourly rates are the market rates for Plaintiff's counsel.  Counsel has done an excellent job in this difficult, hard fought litigation.

95.     Lucini seeks a total of $736,311.54 for attorney's fees and computerized research in the amount of $13,753.74. Included in the petition for fees is $24,400.29 for attorney's fees rendered by the Milan, Italy firm of Simmons & Simmons related to this litigation. The Court finds these fees to be reasonable and necessary for the prosecution of this case.

96.     Lucini bears the burden of proving the reasonableness of its attorney's fees. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). The process of determining a proper fee award begins with a calculation of the "lodestar"—the number obtained by multiplying the number of hours reasonably expended by a reasonable hourly rate. *Eddleman v. Switchcraft, Inc.*, 965 F.2d 422, 424 (7th Cir. 1992). The Court may then reduce or augment the lodestar based on a variety of factors: (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Hensley*, 461 U.S. at 430 n.3. Finally, the degree of a party's overall success is critical in determining the reasonableness of a fee award. *Farrar v. Hobby*, 506 U.S. 103, 114 (1992). The standard is whether the fees are reasonable in relation to the difficulty, stakes, and outcome of the case. *Bankston v. State*

*of Illinois*, 60 F.3d 1249, 1256 (7th Cir. 1995).

97.     The first step in calculating the lodestar is to determine a reasonable hourly rate. Reasonable hourly rates are determined by the prevailing market rates in the relevant community. *Blum v. Stenson*, 465 U.S. 886, 895 (1984). "[T]he market rate is the rate that lawyers of similar ability and experience in the community normally charge their paying clients for the type of work in question." *Bankston*, 60 F.3d at 1256. The Court has reviewed the affidavits of Lucini's counsel and finds that the hourly rates set forth in the fee petition are reasonable.

98.     Lucini has excluded from its request time which was expended on claims other than the Illinois Trade Secrets Act claims, services performed overseeing the European arbitration and Italian criminal proceedings. In addition, over $50,000 in time was previously excluded for time spent by junior lawyers who participated in hearings primarily for training purposes and where the firm felt work was not performed as efficiently as possible.

99.     This Court recognizes that Lucini is only entitled to compensation for the time spent in furtherance of the specific action for which fees are allowed. Where, as here, Lucini is successful on one or more claims all based on a common core of facts, counsel can collect fees for all litigation involving the trade secret count against Defendants. *Rosario v. Livaditis*, 963 F.2d 1013, 1020 (7th Cir. 1992); *Becovic v. City of Chicago*, 296 Ill. App. 3d 236, 242, 694 N.E.2d 1044, 1048 (1st Dist. 1998) (applying Illinois law). Lucini has excluded the time devoted to claims other than the trade secret claim. The Court finds the exclusion to be

proper.

100.     The Court allows the computerized legal research charges in the amount of $13,753.74, which represents a 10% reduction for non-ITSA research. *In the Matter of Continental Illinois Securities Litigation*, 962 F.2d 566, 570 (7th Cir. 1992) (allowing recovery for computerized research costs).

### Sanctions

101.     The Court awards non-taxable costs in the amount of $41,848.00 as a result of sanctions previously entered by Judge Norgle. These out-of-pocket costs were the result of last minute deposition cancellations on two separate occasions and for violation of this Court's standing order regarding settlement.

### E.     Declaratory Judgment - Count VII

102.     Under the Declaratory Judgment Act, 28 U.S.C. § 2201, "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). A court may hear such a declaratory judgment action when it will settle a particular controversy and clarify the legal relations in issue. "In other words, there must be 'an actual, substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Johnson v. Rohr-Ville Motors, Inc.*, 64 F. Supp. 2d 737, 739 (N.D. Ill. 1999) (internal quotations omitted).

103. Lucini asserts that it had a right to terminate its contractual relationships with Defendants and to break off negotiations over a more expanded relationship based on its discovery of Defendants' breach of fiduciary duty and misappropriation and use of Lucini's trade secrets. Defendants dispute that they committed any of the underlying acts (although they offered no evidence at trial in support of their position) and therefore deny that Lucini had any right to terminate the contracts or break off negotiations. There is an actual dispute between the parties as to the right to terminate if material fraud or breach of fiduciary duty occur. A determination of the validity of Lucini's termination for the stated reasons is of sufficient immediacy and importance that it merits the issuance of a declaratory judgment because it will impact the parties' resolution of ongoing disputes from their fractious "divorce."

104. Based on the Court's determination that Defendants willfully misappropriated Lucini's trade secrets, the Court finds that Lucini is entitled to a declaration that it properly terminated its contractual relations with Defendants and it properly broke off negotiations over a more expanded relationship with Defendants.

## F.    Preemption Revisited

105. The ITSA displaces "conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret." 765 ILCS 1065/8(a). This preemption does not affect contractual remedies or "other civil remedies that are not based upon misappropriation of a trade secret." 765 ILCS 1065/8(b).

Interpreting this language, courts have determined that the ITSA is the exclusive remedy for misappropriation of trade secrets, but it does not affect common law claims based on other theories. *Automed Technologies, Inc. v. Eller,* 160 F. Supp. 2d 915, 922 (N.D. Ill. 2001). Thus, claims based on something more than the trade secret misappropriation are not preempted. *Thomas & Betts Corp. v. Panduit Corp.,* 108 F. Supp. 2d 968, 971 (N.D. Ill. 2000).

106.   At the motion to dismiss stage, this Court's decision denying Defendant's motion to dismiss counts I - V of the First Amended Complaint was made without the aid of a definitive interpretation of the clause from the Supreme Court of Illinois. *Lucini Italia Co. v. Grappoini,* 231 F. Supp. 2d 764, 767 (N.D. Ill. 2002).   The Supreme Court still has not clarified the issue; however, the Court makes the following determination based on the same law, but with a more developed factual record.

107.   At the motion to dismiss stage, the Court sustained the common law claims to the extent they were independent of the trade secret claim.   At this stage, the Court finds that the facts relating to the breach of fiduciary duty, fraud, and promissory estoppel claims are inextricably linked to the trade secret claim.   All facts are part of the same trade secret theft: Defendants abused their position to obtain and inappropriately use secret information to their advantage and the Plaintiff's detriment.   Accordingly, all damages are awarded under the trade secret count.   This Court made findings and entered judgment regarding the other counts, in the event on later review they are deemed to survive independently.   The Court

intends that Plaintiff's recover no more than the damages awarded under the Illinois Trade Secrets Act count.

## III. CONCLUSION

Defendants stole Plaintiff's trade secrets and their corporate opportunity. They deprived a family of their financial future and business dreams. Justice requires that Defendants be made to pay for the damages they caused to Plaintiff and that Defendants be stopped from further unlawful conduct involving Plaintiff's trade secrets. **For the reasons set forth in this opinion, the Court directs the Clerk of the Court to enter judgment in favor of Plaintiff, Lucini Italia Company, and against Defendants, Guiseppe Grappolini and Grappolini G. s.r.l., an Italian limited liability company, by means of the Final Judgment Order dated April 24, 2003, granting Plaintiff monetary damages in the amount of $6,761,913.20, a declaratory judgment, and a permanent injunction against Defendants.**

**SO ORDERED THIS 24th DAY OF APRIL, 2003.**

_Morton Denlow_
**MORTON DENLOW**
**United States Magistrate Judge**

**Copies mailed to:**

Steven C. Florsheim
Claire P. Murphy
Robert D. Cheifetz
SPERLING & SLATER, P.C.
55 West Monroe Street
Suite 3300
Chicago, IL 60603
Attorneys for Plaintiff

Giuseppe Grappolini
Grappolini G. s.r.l.
Via F. Turati, 26
52024 Loro Ciuffenna
Italy

[Pro Se]

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| LUCINI ITALIA COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **No. 01 C 6405** |
| | ) | |
| GIUSEPPE GRAPPOLINI, and | ) | **Magistrate Judge Morton Denlow** |
| GRAPPOLINI G. s.r.l., | ) | |
| | ) | |
| Defendants. | ) | |

DOCKETED

APR 2 8 2003

## FINAL JUDGMENT ORDER

This matter was heard by the Court in a bench trial on February 24 and 25, 2003. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The parties were given notice of the trial and the opportunity to present their evidence. The issues have been tried and the Court has entered a Memorandum Opinion and Order dated April 24, 2003.

**IT IS HEREBY ORDERED AND ADJUDGED** that with respect to Plaintiff's First Amended Complaint, judgment is entered in favor of Plaintiff, Lucini Italia Company ("Lucini"), and against Defendants, Giuseppe Grappolini and Grappolini G.s.r.l., ("Defendants") on Counts I (breach of fiduciary duty), III (fraud), IV (promissory estoppel), VI (Illinois Trade Secrets Act) and VII (declaratory judgment), and that Counts II (constructive fraud) and V (unjust enrichment) were withdrawn before trial. Because the Court finds that Count VI preempts the claims under Counts I, III and IV, no relief will be

126

awarded pursuant to Counts I, III and IV.

In accordance with the findings of fact and conclusions of law set forth in the Memorandum Opinion and Order of the Court, judgment is entered in favor of Plaintiff, Lucini Italia Company, and against Defendants, Giuseppe Grappolini and Grappolini G. s.r.l, jointly and severally as follows:

## MONETARY DAMAGES

1. Defendants are ordered to pay to Plaintiff compensatory damages for lost profits in the amount of $4,170,000.00.

2. Defendants are ordered to pay to Plaintiff compensatory damages for development costs of its Lucini Essential Oils product in the amount of $800,000.

3. Defendants are ordered to pay to Plaintiff punitive damages in the amount of $1,000,000.00.

4. Defendants are ordered to pay to Plaintiff attorney's fees and non- taxable costs in the amount of $750,065.28.

5. Defendants are ordered to pay to Plaintiff sanctions in the amount of $41,848.00.

6. The total amount of monetary damages awarded to Plaintiffs against Defendants as set forth in paragraphs 1. through 5. above is $6,761,913.20.

## DECLARATORY JUDGMENT

7.    The Court declares that Plaintiff had good and sufficient cause to withdraw from its contractual relationship with Defendants and to cease its negotiations of new contracts with Defendants based on Defendants' misappropriation of Lucini's trade secrets.

## PERMANENT INJUNCTION

8.    Because Defendants have unlawfully stolen and are using Plaintiff's trade secrets for their own benefit, the Court hereby issues a permanent injunction barring Defendants, and any of their officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them, who receive actual notice of this order by personal service or otherwise, from disclosing or using, directly or indirectly, the results of Plaintiff's marketing research, marketing plans, product designs, formulations and/or flavor profiles for premium extra virgin olive oil products, including essential oil flavored products. Without limitation, the Court's Order bars Defendants (a) from marketing essential oil flavored olive oils either in the single flavors of garlic, rosemary, lemon, pepper, or basil or in combination flavors substantially similar to Lucini's Savory Lemon with Mountain Black Pepper, Robust Garlic with Wild Rosemary, Tuscan Herb with Summer Basil; (b) from marketing or selling any products utilizing essential oils purchased from Vegetal Progress; (c) from using drawings or images substantially similar to those Lucini

disclosed to Defendants (which include the drawings and images on Trial Exhibits 9-12); (d) from using the packaging configuration of Lucini's LEO Trial Pack; and (e) from selling, disclosing, private labeling, or offering consulting services with respect to extra virgin olive oil with the chemical and organoleptic characteristics of Lucini Premium Select (or any substantially similar oil) or the methods of creating such oil.

9.    The Court finds there is no just cause to delay enforcement or appeal of this Final Judgment Order.

10.   Plaintiff is awarded its court costs and shall file its bill of costs on or before May 7, 2003.

11.   The Court shall retain jurisdiction to enforce the terms of this Final Judgment Order.

**SO ORDERED THIS 24th DAY OF APRIL, 2003.**

_____
**MORTON DENLOW**
**United States Magistrate Judge**

**Copies mailed to:**

Steven C. Florsheim
Claire P. Murphy
Robert D. Cheifetz
SPERLING & SLATER, P.C.
55 West Monroe Street
Suite 3300
Chicago, IL 60603
Attorneys for Plaintiff

Giuseppe Grappolini
Grappolini G. s.r.l.
Via F. Turati, 26
52024 Loro Ciuffenna
Italy

[Pro Se]

4